# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JOSHUA D.,[1]

        Plaintiff,

vs.

FRANK BISIGNANO,[2]
Commissioner of Social Security,

        Defendant.

No. 24-CV-2056-LTS-KEM

**REPORT AND
RECOMMENDATION**

---

Plaintiff Joshua D. seeks judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff argues that the administrative law judge (ALJ), John Priester, erred by finding his migraines, traumatic brain injury, and mental impairments were nonsevere; in evaluating the medical opinion of his treating psychiatric provider; and in determining he could perform his past work as actually performed. I recommend **affirming** the ALJ's decision.

## I.    BACKGROUND

Plaintiff graduated from high school in 2005, taking advanced courses without difficulty. AR 824, 933. He enlisted in the army and attended two years of college before deployment. AR 435, 824, 933. He completed several tours overseas, where he

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Frank Bisignano is substituted for his predecessor in accordance with Federal Rule of Civil Procedure 25(d).

was exposed to at least three rocket-propelled grenades, and returned from Afghanistan in August 2011. AR 530, 559, 1210. He reenrolled in college but dropped out due to issues concentrating. *Id.*

After his return from active duty, for several years throughout the 2010s, Plaintiff drank heavily. *See, e.g.*, AR 483, 824. He obtained medical and psychiatric treatment through Veterans Affairs (VA) and reported difficulties with sleeping, irritability, anxiety around groups of people, and memory, noting he had to write down everything at home and work. *See* AR 387, 530, 552. Ultimately, however, he was able to maintain full-time employment, working as a correctional officer at a prison and then a security guard at a power plant for several years. AR 260, 323, 387, 566. Plaintiff got his drinking under control, and he successful completed his undergraduate degree in business in 2019 with a high GPA and without accommodations. AR 259, 823, 1005, 1024. He worked part-time at a vape shop while attending college. *Id.*

Plaintiff married his long-term girlfriend and moved across the state for his wife's job, along with his elementary-school-aged stepson. AR 434, 987, 996, 1003. He began working full time as a bank teller in a lead role in which he also supervised other tellers. *Id.*; AR 259-60, 323, 552. In May 2020, he reported he had recently begun suffering two to three headaches a week, and he was placed on prescription headache medicine for the first time (verapamil and sumatriptan). AR 955, 960-61, 964, 966. In July 2020, he established care with a psychiatric provider to continue the medications he was taking to help with sleep, depression, and anxiety (cyproheptadine and mirtazapine). AR 933-34, 936. Also in July 2020, he underwent a sleep study because of reports of snoring and not feeling well rested after sleep; he was diagnosed with obstructive sleep apnea and provided with a CPAP[3] machine. AR 940-41. Plaintiff struggled to tolerate the CPAP machine, despite trying different masks, indicating he often woke up panicked a few hours into sleeping and ripped the CPAP mask off. AR 882, 891.

---

[3] Continuous Positive Airway Pressure.

Plaintiff worked as a bank teller for about a year before obtaining a veterans-outreach job with the state in November 2020, contacting veterans to help them with employment and resources available to them. AR 35, 323, 902. The VA psychiatric team wrote him a note to be able to bring his "service dog" with him to work (treatment records reflect that he reported being in the process of obtaining a service dog in May 2018; that he brought his dog to therapy appointments throughout 2019; and that he once called his dog an "emotional support dog," rather than a service dog; it is unclear whether he had brought the dog to work at the bank). AR 469, 1024, 1532. Initially, Plaintiff worked long hours, reporting six days a week he did nothing more than drive forty-five minutes to work, work a ten-hour shift, drive home, eat dinner, and sleep. AR 868, 874-75. In March 2021, he asked about a work note limiting his shifts to "8 hour days as some of his coworkers have done," which his primary care provider provided as "reasonable" (limiting him to a forty-hour workweek) so he had time for acupuncture, chiropractic treatment, adequate sleep, and other self-care tasks. AR 816, 841, 851.

Sometime in early 2021, Plaintiff began seeing non-VA provider Mark Johnson, MD, a specialist in headaches. The record is missing some of Dr. Johnson's treatment notes, but notes from other providers reflect that Dr. Johnson took over managing all of Plaintiff's medications for a while. Dr. Johnson started Plaintiff on Depakote (divalproex) and duloxetine (Cymbalta) as prophylactic measures against headaches (in addition to verapamil), discontinued mirtazapine and replaced it with amitriptyline (both antidepressants), and prescribed Nurtec as an abortive migraine medication (discontinuing sumatriptan, which Plaintiff stated had no effect). AR 805, 809, 824, 828, 858, 890, 894. Plaintiff could not get Nurtec through the VA, but he was able to purchase it through another pharmacy. *Id.* Prior to Dr. Johnson's medication regimen, Plaintiff had reported near-daily severe headaches and migraines, although not debilitating with verapamil; he indicated much improvement in severity with Dr. Johnson's medication changes (despite daily headaches). *Id.*

3

In March 2021, Plaintiff applied for "caregiver funding" from the VA to compensate his wife for the support she provided him. AR 854. Plaintiff and his wife indicated that Plaintiff needed reminders from his wife to brush his teeth, eat, and shower due to lack of motivation; that his wife planned trips and visits with friends, as otherwise Plaintiff would not leave the house; that his wife managed their money; and that Plaintiff was able to go to national parks but suffered anxiety in busier areas and could not go to grocery stores. AR 831, 844.

In June 2021, Plaintiff underwent a neuropsychological consult with Matthew Semla, PsyD, due to complaints of memory loss, noting he became easily distracted, had difficulties multitasking, and required the use of written notes or a digital organizational system to be successful at work. AR 823. Dr. Semla's testing revealed a generally normal "cognitive profile" with "subtle inefficiencies within visual memory, general recognition memory, and an isolated reduction on a verbal mental flexibility task," which Dr. Semla "attributed to normal variance." AR 826. Rather than a traumatic brain injury or other neuropsychological issue, Dr. Semla opined that Plaintiff's mental health, pain complaints, and poor sleep "likely cause[d] the increased concentration difficulties and distractibility." *Id.* He recommended psychotherapy, the continued use of written reminders, and another CPAP consultation to see if a mask existed Plaintiff could tolerate. *Id.* A counseling appointment was scheduled as recommended, but Plaintiff missed the appointment and did not reschedule. AR 818.

In September 2021, Plaintiff's psychiatric medication provider added Seroquel (quetiapine) to help with sleep, which Plaintiff reported helped him fall asleep faster (although he continued to report poor sleep quality). AR 805, 812, 814. Throughout 2022, Plaintiff continued to report some issues with headaches, sleep, and anxiety, but his symptoms were largely stable on medications, and he continued to work full time. *See* AR 765, 772-73, 775-60, 783-84, 1616-17. Because he was still having breakthrough headaches, in June 2022, Dr. Johnson advised taking Nurtec twice a week, regardless of whether he needed to use it as an abortive; and in October 2022, when Plaintiff continued

4

to report headaches twice a week, Dr. Johnson upped the Nurtec dosage to every other day, noting Plaintiff's insurance covered the drug. AR 783-84, 1616-17. Plaintiff continued on largely the same psychiatric medications, although in summer 2022, his psychiatric medication provider added propranolol as needed for anxiety to help in social situations such as public speaking (Plaintiff did not end up using it); and increased his amitriptyline dosage to help with sleep. AR 730, 756, 760, 1227, 1229.

In May 2022, the VA issued a decision finding Plaintiff 100% disabled as of December 11, 2021 (due to mental health and other issues). AR 193-95. Plaintiff and his wife welcomed a new baby in November 2022. AR 758. Plaintiff went on paternity leave in early 2023, and he never returned to work, staying home with the baby instead. AR 20, 258, 730, 741, 1199. He also reported working on his business of making mead to sell at farmer's markets and other venues. AR 1192.

Throughout 2023, Plaintiff reported stable mental-health symptoms. AR 732-33, 739, 748, 1191-92, 1203, 1210, 1612-15. By his request, he attended three psychotherapy sessions in early 2023, but he ultimately discontinued these appointments after missing one and declining to reschedule. AR 1187-88, 1191-92, 1203, 1379-80, 1210-11. In April 2023, he established care with psychiatric nurse practitioner Bethany Williams (NP Williams) for medication management, who largely continued the same medications, increasing his amitriptyline dosage to help with sleep and also suggesting he regularly take propranolol as it had been previously prescribed (NP Williams's notes also reflect Plaintiff declined a referral for cognitive behavior therapy for insomnia). AR 730-34, 745, 1443. Dr. Johnson also increased Plaintiff's divalproex dosage around that time to help with anxiety and sleep. AR 1614-15. Plaintiff continued to report poor sleep quality throughout 2023 and faced issues with VA approval for alternatives to a CPAP machine to treat sleep apnea. AR 748, 754, 1351. He continued to see Dr. Johnson for treatment of his headaches, reporting in early 2023 that he was doing much better with Nurtec, and later in the year, stating that he was suffering several breakthrough headaches a week due to issues with VA coverage for Nurtec. AR 1612,

5

1615.  Plaintiff's wife noted in an August 2023 function report that she took their infant daughter to daycare.  AR 267.

In January 2024, Plaintiff underwent a second sleep study to see if he qualified for surgery to treat sleep apnea (his first sleep study showed sleep apnea too mild for surgery), and the doctor concluded Plaintiff did not have obstructive sleep apnea (despite some "respiratory events" and snoring).  AR 800, 1447, 1464.  At appointments with NP Williams throughout the first half of 2024, Plaintiff reported low energy, irritability, isolationist tendencies, and continued sleep issues, but he declined changes in medications other than in early January 2024 (when NP Willaims increased his bedtime dosages of quetiapine and amitriptyline).  AR 1433, 1439, 1443, 1454-55, 1462, 1522-28, 1532-36.  In March 2024, Plaintiff reported increased headaches due to issues with VA insurance coverage for Nurtec; he reported suffering one to two episodic headaches a month and only taking Nurtec once the past month.  AR 1622.  Plaintiff believed that the VA would cover his Nurtec if prescribed by a neurologist, but the VA continued to deny coverage after he met with a non-VA neurologist in June 2024.  AR 1523, 1528, 1558-59, 1626.

Plaintiff filed for Social Security DI benefits in May 2023, alleging a disability onset date of February 10, 2023 (when he stopped working to take paternity leave).  AR 71.  He alleged disability due to "other specified trauma and stressor related disorder, radiculopathy in both legs, [gastroesophageal reflux disease], migraine, lumbar strain, patellofemoral syndrome in both knees, right rotator cuff tear, [and] tinnitus"—the reasons the VA had found him disabled.  *Id.*  Plaintiff indicated his conditions were severe enough to stop him from working as early as August 2021.  AR 258.  The Social Security Administration denied his application on initial review in October 2023 and reconsideration in February 2024.  AR 70-87.

Plaintiff requested further review.  The ALJ held a hearing in July 2024, at which Plaintiff and a vocational expert (VE) testified.  AR 29-30.  At the hearing, Plaintiff testified that he worked for himself four to six hours a week making mead.  AR 34.  He testified that he quit his job with the state due to increased migraines and difficulty getting

his medications. AR 36. He indicated his doctor had given him samples of Nurtec, so his migraines were still relatively well controlled, but he stated he only had a month's supply left. AR 37-38. He reported his toddler daughter attended daycare. AR 56-57.

The ALJ issued a written opinion on August 30, 2024, following the five-step process outlined in the regulations[4] to determine whether Plaintiff was disabled during the relevant time period. AR 10-23. The ALJ found Plaintiff suffered from the severe impairments of lumbar spondylosis, bilateral patellofemoral syndrome, and right shoulder impingement syndrome. AR 13. The ALJ found Plaintiff's traumatic brain injury, obstructive sleep apnea, headaches, posttraumatic stress disorder (PTSD), anxiety, and major depressive disorder did not cause more than minimal limitation on his ability to perform basic work activities and were therefore nonsevere. AR 13-14. To aid in steps four and five, the ALJ determined Plaintiff's residual functional capacity (RFC),[5] finding Plaintiff could perform light work with additional exertional limitations, as well as "never work[ing] at unprotected heights or with moving mechanical parts" or "in humidity or wetness." AR 15. The ALJ relied on VE testimony and found Plaintiff could return to his past work as a career information specialist (his veterans-outreach job) as actually performed. AR 21.[6] The ALJ also found a significant number of other jobs existed in the national economy Plaintiff could perform, including office helper, clerical routing clerk, and mail clerk. AR 22. Thus, the ALJ found Plaintiff not disabled from February 10, 2023, through August 30, 2024, the date of the decision. AR 23.

---

[4] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." *Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* § **404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. *Goff*, 421 F.3d at 790.

[5] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019).

[6] The VE testified Plaintiff could not perform his past work as generally performed. AR 60-61.

The Appeals Council denied Plaintiff's request for review on September 26, 2024 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[7] Plaintiff filed a timely complaint in this court (Doc. 1).[8] The parties briefed the issues (Docs. 8, 10, 11) and the Honorable Leonard T. Strand, District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[9] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[10] The court "do[es] not reweigh the evidence or review the factual record de novo."[11] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[12]

Plaintiff argues that the ALJ erred in three respects: evaluating the persuasiveness of NP Williams's opinion; failing to find his migraines, traumatic brain injury, or mental impairments severe at step two; and determining he could perform his past work without

---

[7] *See* **20 C.F.R. § 404.981**.

[8] *See* **20 C.F.R. § 422.210(c)**.

[9] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[10] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[11] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[12] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

8

evidence of how it was actually performed.

### A. Persuasiveness of NP Williams's Opinion

Plaintiff established care with NP Williams as his psychiatric medication provider in April 2023. AR 738-45, 1198-1202. He had additional appointments with NP Williams in July 2023, January 2024 (twice), February 2024, April 2024, and June 2024. AR 729-33, 1183-86, 1433-43, 1454-58, 1481-85, 1522-28, 1532-41. In June 2024, NP Williams filled out a form opining as to the functional limitations caused by Plaintiff's mental impairments. AR 1545-50.

The ALJ must "evaluate the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] policies and evidentiary requirements."[13] The first two factors, supportability and consistency, are the most important.[14] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[15] The Eighth Circuit has held that the court may review only "whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether" the ALJ's supportability and consistency analysis are separately "supported

---

[13] **20 C.F.R. § 404.1520c(a), (c)**.

[14] **20 C.F.R. § 404.1520c(a)**.

[15] **20 C.F.R. § 404.1520c(a), (b)(2)**.

by substantial evidence."[16]  Instead, any evaluation of supportability and consistency "is simply part of determining whether the ALJ's ultimate persuasiveness and [RFC] findings are supported by substantial evidence."[17]

NP Williams checked boxes indicating that Plaintiff was unable to meet competitive standards[18] in the following areas of mental functioning:

- Working in coordination with or proximity to others without being unduly distracted;
- Performing at a consistent pace without an unreasonable number and length of rest periods;
- Getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- Dealing with normal work stress;
- Understanding, remembering, and carrying out detailed instructions; and
- Dealing with stress of semiskilled and skilled work.

AR 1547-48.  She indicated he was "seriously limited, but not precluded"[19] from:

- Remembering work-like procedures;
- Maintaining regular attendance and being punctual within customary, usually strict tolerances;
- Sustaining an ordinary routine without special supervision;
- Accepting instructions and responding appropriately to criticism from supervisors;
- Responding appropriately to changes in a routine work setting;
- Traveling in unfamiliar places; and
- Using public transportation.

*Id.*  She noted that speed, precision, complexity, deadlines, working within a schedule, making decisions, and fear of failure at work would all impact Plaintiff's ability to tolerate

---

[16] *Cropper v. Dudek*, 136 F.4th 809, 814-15 (8th Cir. 2025).

[17] *Id.* at 815.

[18] The form explained "unable to meet competitive standards" meant unable to "satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting."  AR 1547.

[19] The form defined "seriously limited, but not precluded" as meaning "seriously limited and less than satisfactory, but not precluded in all circumstances."  *Id.*

work stress. AR 1549. To support her findings, she noted Plaintiff "describes difficulty with memory and forgetfulness, significant concentration difficulties, and increased symptoms of anxiety," which would likely "cause stressful situations at work to be overwhelming." AR 1548. She also explained that he reported "significant difficulty with concentration and being able to deal with others [and] . . . symptoms of chronic irritability and agitation," and would have difficulty maintaining pace and dealing with normal workplace stress due to his chronic PTSD and anxiety symptoms. AR 1547. She noted he would experience "very significant anxiety symptoms if required to travel to an unfamiliar place or use public transportation." AR 1548. She stated "clinical findings" supporting her conclusions included "anxiety, depression, psychomotor agitation, irritable tense, describes 'obsessional thoughts,' isolation – extreme difficulty leaving house – often unable to tolerate, low energy, low appetite, low motivation, [and] little interest in activities." AR 1545. She additionally opined that Plaintiff would miss more than four days of work per month, noting his daily depression and anxiety symptoms could be unpredictable, and he would do better some days than others. AR 1549. She estimated that her opinion of Plaintiff's limitations applied as of June 2019. AR 1550.

The ALJ found that NP Williams's opinion was "not persuasive," as it was inconsistent with both her treatment notes and the overall record. AR 18. First, the ALJ noted that while NP Williams opined that Plaintiff suffered limitations that would have prevented him from working as of June 2019, Plaintiff worked full time through 2022. The ALJ could consider that treatment records from 2018 through the relevant time period (2023 and 2024) reflect that Plaintiff's mental-health symptoms have largely remained stable, yet Plaintiff was able to complete his bachelor's degree in business and work full time as both a bank teller and doing veterans outreach. Plaintiff reported being a homebody and suffering issues with sleep, anxiety, and memory both before and during the relevant time period; despite these complaints, he was able to work without missing four days of work a month, to remember and carry out detailed instructions with the use

11

of notes and reminders, and to interact with customers and clients at his jobs.

The ALJ also noted that NP Williams's objective examinations consistently revealed normal findings. AR 18. As the ALJ noted, at each appointment, NP Williams observed Plaintiff was calm and cooperative with good eye contact and grooming; normal speech and intact language with good insight and judgment; memory grossly intact but no formal testing; and average fund of knowledge. AR 731, 743, 1435-36, 1442, 1456-57, 1525, 1535. Plaintiff argues that the ALJ ignored that NP Williams's objective findings of mood and affect often revealed anxiety and depression. NP Williams noted Plaintiff's report of his mood—"good," "tired and in pain," "depressed and anxious," "substantially better," "still super irritable but sleeping better," "awful," and "irritable"—but still consistently observed his affect to be "congruent with full range, stable, and appear[ing] euthymic" or twice, neutral. *Id.* "Euthymic is a medical term referring to a joyful or tranquil mood, neither manic nor depressed."[20] Thus, it does not appear that NP Williams observed any outward signs of anxiety or depression (beyond Plaintiff's reports), consistent with the ALJ's conclusion.

The ALJ also found an inconsistency with NP Williams's opinion that Plaintiff suffered drowsiness, fatigue, and grogginess as medication side effects. AR 18. As the ALJ noted, NP Williams's treatment notes reflect that Plaintiff consistently denied medication side effects. AR 18, 730, 732, 1434, 1436, 1455-56, 1459, 1483, 1523, 1526, 1533, 1536. Plaintiff did report trembling in his hands at his first appointment with NP Williams in early April 2023, but not the side effects mentioned by NP Williams's opinion (Dr. Johnson adjusted Plaintiff's medications to address the trembling). AR 1199, 1614.

Plaintiff argues that the ALJ focused solely on NP Williams's objective examinations without considering the other symptoms she cited in support of her opinion.

---

[20] *Sultan v. Barnhart*, 368 F.3d 857, 861 n.2 (8th Cir. 2004).

I disagree. NP Williams stated Plaintiff's issues with memory, anxiety, irritability, motivation, and isolationism supported her opinion, but as the ALJ suggested, Plaintiff reported similar symptoms in treatment notes going as far back as 2018, when Plaintiff was able to complete a college degree and maintain full-time skilled employment. Despite his complaints, Plaintiff largely reported stable symptoms and declined any changes to his mental-health medications. The ALJ also noted the inconsistency between NP Williams's treatment notes and her opinion on medication side effects. And the ALJ could conclude that the "multiple mental status examinations . . . reveal[ing] no abnormalities" were inconsistent with findings of extreme limitations.[21]

I recommend finding that the ALJ did not err in evaluating the supportability and consistency factors and that substantial evidence supports the ALJ's persuasiveness analysis of NP Williams's opinion.

### B. Failure to Find Migraines, Traumatic Brain Injury, or Mental Impairments Severe at Step Two

Plaintiff argues that the ALJ erred in failing to find some of his impairments severe. During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment[]" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[22] If the ALJ determines the claimant suffers from a medically determinable mental impairment, the ALJ must next decide whether the impairment is severe by evaluating the degree of functional limitation caused by the impairment.[23] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability

---

[21] *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010).

[22] **20 C.F.R. § 404.1521**.

[23] *Id.*; **20 C.F.R. § 404.1522**.

to do basic work activities,"—such as "[u]nderstanding, carrying out, and remembering simple instructions; . . . [u]se of judgment; . . . [r]esponding appropriately to supervision, co-workers, and usual work situations; [or] . . . [d]ealing with changes in a routine work setting."[24]  An impairment is not severe if it "would have no more than a minimal effect on the claimant's ability to work."[25]  "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard), "but it is also not a toothless standard."[26]

### 1. Migraines

At step two, the ALJ recognized that Plaintiff suffered headaches, but he concluded "they do not have more than a minimal effect on the claimant's ability to perform basic work activities."  AR 13.  The ALJ found that Plaintiff's "headaches were adequately controlled with Nurtec," such that "[t]he severity of his headaches was dramatically less," and he testified to only suffering "one migraine in the last two months."  AR 13.  Plaintiff argues that the ALJ ignored his insurance issues with Nurtec, which resulted in his taking Nurtec only as an abortive rather than prophylactically toward the end of the relevant time period.  Plaintiff argues that he would "potentially miss two days of work for migraines not relieved by a dwindling Nurtec sample supply" and that the ALJ should have developed the record on when Plaintiff obtained the Nurtec samples, since Plaintiff perhaps suffered even more frequent headaches from August 2023 to when he obtained the samples.

In May 2020 (when working full time as a bank teller), Plaintiff first complained of headaches to his primary care provider, noting a history of suffering a headache once

---

[24] **20 C.F.R. §§ 404.1520(c), 404.1522**.

[25] *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)); *accord* **20 C.F.R. § 404.1522(a)**.

[26] *Kirby*, 500 F.3d at 708; *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989).

14

a month (without medications) that had recently increased to two to three times a week. AR 964. His doctor prescribed verapamil as a preventative and sumatriptan as an abortive medication when he began suffering a headache. AR 963, 966. In June 2020, he met with neurology and continued to report frequent headaches; the neurologist recommended he increase his verapamil dosage and prescribed oxygen therapy at a headache's onset. AR 960-61. The next week, he told his primary care provider that he had not yet increased the dosage and that verapamil provided relief. AR 955. At a physical therapy appointment in August 2020, he reported suffering migraines three times a week. AR 922. In October 2020, he told the pain clinic that verapamil "took the bite out of his headaches" and that neither oxygen nor sumatriptan helped much. AR 890-91, 912. In December 2020 (after he had recently started working 60-hour weeks in veterans outreach), he told his primary care provider that although he suffered a migraine or headache almost daily, verapamil stopped the migraines from becoming debilitating. AR 890. In early 2021, Plaintiff established care with Dr. Johnson, and by April 2021, Dr. Johnson had started Plaintiff on two new prophylactic medications in addition to verapamil (divalproex and duloxetine), changed his antidepressant to amitriptyline, and prescribed Nurtec as an abortive migraine medication (discontinuing sumatriptan). AR 805, 809, 824, 828, 849, 858, 890-91, 894. Around this time, Plaintiff obtained the medical note limiting his work hours to forty a week. AR 841. At the June 2021 neuropsychological consultation, Plaintiff reported chronic headaches and migraines that fluctuated throughout the day but were better with medications. AR 824. In July 2021, he told his psychiatric medication provider that headaches were his main stress. AR 815. In December 2021, Plaintiff reported suffering a migraine and headache almost daily; he stated that daily verapamil stopped the migraines from becoming debilitating and he could "make it home . . . instead of being stuck where he is until the headache lessens," and that Nurtec (obtained from Walmart and not through the VA) worked as a rescue drug. AR 805. His primary care provider concluded his "headaches have improved and stabilized with [his] prophylactic regimen." AR 809. In late December 2021 and into

15

January 2022, Plaintiff suffered a migraine for two weeks along with a COVID-19 infection; Dr. Johnson provided one-time medications to abort the headache (which worked) and released him from work for the next two days. AR 772, 785-86; *see also* AR 797-98, 1257.

Plaintiff next met with Dr. Johnson in June 2022 and reported "success with his prophylactic regimen" to treat headaches, only suffering a migraine once every six weeks. AR 783. Dr. Johnson added Nurtec twice a week, regardless if needed as an abortive. AR 784. A few days later, Plaintiff told his psychiatric medication provider that he continued to have headaches, but they were a little better. AR 756. In October 2022, Plaintiff told Dr. Johnson he continued to have breakthrough headaches a few times a week, but not daily like in the past, and less severe. AR 1616. He stated Nurtec was "quite helpful," and Dr. Johnson increased his use of Nurtec as a prophylactic to every other day. *Id.* Dr. Johnson noted it was "lucky" insurance covered Nurtec. AR 1617. In January 2023, Plaintiff told his primary care provider that his headaches had "significantly improved" since starting Nurtec and that if he missed a dose, he would get a headache. AR 747, 753.

In March 2023 (after Plaintiff had stopped working), Plaintiff told Dr. Johnson he suffered breakthrough migraines about once or twice a month, aborted with Nurtec. AR 1615. He reported "doing so much better." *Id.* Dr. Johnson's treatment notes reflect that he "urg[ed Plaintiff] to use [Nurtec] at least twice a week even if he does not take [an as needed] dose." AR 1614. Dr. Johnson's August 2023 treatment note reflects that Plaintiff's headaches had been "better, now he is breaking through several times per week because he went off Nurtec when he could not fill it." AR 1612. Dr. Johnson indicated they would attempt to obtain Nurtec through Plaintiff's wife's insurance, rather than through the VA. *Id.* Dr. Johnson concluded Plaintiff was "back using Nurtec again, which I hope will be helpful." AR 1613. Plaintiff and his wife completed function reports for the Social Security Administration in late August 2023, and neither mentioned

Plaintiff suffering headaches or migraines (and he denied any change of condition in December 2023 and March 2024 forms). AR 265-81, 283, 294.

In February 2024, Plaintiff's primary care provider noted Plaintiff's headaches were controlled with medications. AR 1464. In March 2024, Plaintiff told Dr. Johnson that he could not refill his Nurtec prescription through the VA until he saw a neurologist. AR 1622. Plaintiff stated he still had some Nurtec to use as an abortive medication until he met with neurology. *Id.* Plaintiff reported using Nurtec only once in the last month and suffering only "[one to two] episodic headaches per month[,] down substantially" from when he started his "prophylactic regimen of amitriptyline, Depakote, duloxetine, and verapamil." *Id.* On April 1, 2024, Plaintiff told his psychiatric medication provider that he was currently suffering a migraine and felt awful. AR 1522-23. He reported increased migraines due to an inability to fill his Nurtec prescription. AR 1528. In June 2024, Plaintiff met with a non-VA neurologist, reporting his migraines had been "relatively well-controlled" with Dr. Johnson's prophylactic regimen that included taking Nurtec twice a week. AR 1626. Plaintiff reported "prior to that he was getting 3 migraines per week or 12/month[,] and with the Nurtec 2 times per week prophylactically he was down to 1 migraine in the last 2 months." *Id.* The VA still refused to cover Plaintiff's Nurtec prescription. AR 1558-59.

At the ALJ hearing in late July, Plaintiff testified that he quit his job due to "more migraine issues" once the VA stopped covering Nurtec (this timeline is not supported by the record). AR 36. He testified that he suffered migraines "two to three times a week without medication." AR 37. He acknowledged, however, that he had medication samples provided by his doctor (although he said he had less than a month's supply left). *Id.* He testified that he had last had a migraine the previous month, and Nurtec did not work to abort it like normal. AR 38. He testified that a migraine lasted for a minimum of several hours and up to 48 hours. *Id.*

Substantial evidence supports the ALJ's conclusion that Plaintiff's migraines and headaches (as controlled with medications) did not have more than a minimal effect on

17

his ability to work during the relevant time period. Even before Dr. Johnson prescribed Nurtec twice a week as a prophylactic measure in June 2022, treatment records reflect substantial improvement in Plaintiff's migraines and headaches. Although Plaintiff reported daily headaches, his prophylactic regimen (which did not include Nurtec) lessened their severity, and he reported suffering a migraine only once every six weeks. There is no evidence that his headaches and migraines impacted his ability to work his (skilled) job during this time. And even once Plaintiff began having issues with insurance coverage for Nurtec in August 2023, Plaintiff continued to report suffering only one migraine every two months (and saving Nurtec to use as an abortive)—as the ALJ noted.

It is unfortunate that Plaintiff was having difficulty obtaining a medication that helped him, and that he was set to run out of this medication shortly after the relevant time period at issue here. But the ALJ did not err in focusing on the frequency and severity of Plaintiff's headaches as they stood during the relevant time period. Despite Plaintiff's issues with obtaining Nurtec, substantial evidence supports that the medications available to him (other prophylactics and a small supply of Nurtec to use as an abortive) were sufficient to treat his headaches and migraines. To find otherwise would require the court to reweigh the evidence, which is not allowed under the deferential substantial-evidence standard of review.

I recommend finding that the ALJ did not err in determining Plaintiff's headaches and migraines did not have more than a minimal effect on his ability to perform basic work activities and were therefore nonsevere.

### 2. *Traumatic Brain Injury and Mental Impairments*

Plaintiff also argues that the ALJ erred in finding his traumatic brain injury, PTSD, depression, and anxiety would have no more than minimal limitation on his ability to

18

perform basic mental work activities.[27]  When evaluating the severity of a mental impairment, the ALJ must consider the claimant's limitations in four broad functional areas:  (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; (3) adapting or managing oneself; and (4) interacting with others.[28]  Although subject to exception, as a general rule, if the claimant suffers no more than mild limitations in each category, the claimant's mental impairments are not severe.[29]  The ALJ addressed each category and found Plaintiff suffered only mild limitations.  AR 14.  The ALJ did not find Plaintiff's mental impairments severe and included no mental-functioning limitations in the RFC, finding that he could return to his past skilled work.

Plaintiff argues the ALJ erred in finding only mild limitations in memory and in concentration.  In 2012, Plaintiff reported struggling with short-term memory and having to carry a notebook everywhere to write reminders for himself in.  AR 559.  In 2013, he reported withdrawing from college due to memory and concentration difficulties, including forgetting to do homework assignments and a short attention span.  AR 530. He reported having to use numerous written reminders at home and work, including using a notepad and crossing off tasks at work, as well as using calendar reminders on his smart phone.  *Id.*; AR 506.  Neuropsychological memory testing in 2013 was largely normal, although the provider noted that his "significantly lower" results in "delayed memory index" were consistent with his complaints of "difficulty remembering routine activities" and coworker's names.  AR 532.  He again complained of memory issues in October

_____

[27] The ALJ did not provide reasoning for the severity of Plaintiff's traumatic brain injury.  In determining his entitlement to VA disability, the VA considered the effects of Plaintiff's traumatic brain injury along with his mental impairments, since both caused reported issues with memory (multiple providers suggested PTSD rather than traumatic brain injury caused Plaintiff's symptoms, *see* AR 410, 826).

[28] **20 C.F.R. § 404.1520a(c)(3)**.

[29] **20 C.F.R. § 404.1520a(d)(1)**.

2020, noting that he forgot appointments, did not follow-up with neurology like he was supposed to, and could not remember the education doctors provided. AR 914. In spring 2021, he called to ask for a list of his medications in writing, and he applied for caregiver benefits for his wife, stating that his wife reminded him to brush his teeth and shower; he needed reminders to take his medications (phone alarms and his wife); and his wife set up his pillboxes and handled bills. AR 730, 823, 844, 858. In June 2021, at a neuropsychological consult, he reported worsening short-term memory over the last four years, including forgetting recent conversations and events and misplacing items and lists. AR 823. He reported difficulties multitasking and becoming easily distracted, and said he had been using a digital organization system at work the last two weeks that had been helpful (prior to that, his work office was covered in Post-it note reminders). *Id*. He again underwent formal memory testing, in which the provider concluded he "demonstrated a cognitive profile generally within expected limits, albeit subtle inefficiencies within visual memory, general recognition memory, and an isolated reduction on a verbal mental flexibility task," with these "scattered reductions . . . likely attributed to normal variance" rather than cognitive impairment. AR 826. The provider suggested Plaintiff's limitations were not the result of a traumatic brain injury, but he did recognize Plaintiff's "PTSD, mood (e.g., moderate depression and mild anxiety), sporadic poor sleep, CPAP non-adherence, and chronic pain . . . . likely cause . . . [the] increased concentration difficulties and distractibility that subsequently influence his distractibility and subjective memory complaints." *Id*. The provider noted this conclusion was further supported by Plaintiff's "successful completion of his college degree without accommodations" with a reported "GPA on the high end." AR 823, 826. The provider did not find further neuropsychological treatment necessary, but he recognized Plaintiff might benefit from psychotherapy, use of a CPAP, and continued "visual (e.g., written reminders) or auditory (e.g., alarms) cues and his digital organization tool." AR 826. The provider additionally noted "a structured routine" may "help with efficiency and increase productivity." *Id*. Plaintiff reported good

concentration at appointments in September 2021 and January 2022 and fair concentration in June 2022. AR 756, 773, 812. In February 2023 (after he stopped working), Plaintiff reported (as part of a depression screen) several days in which he had trouble concentrating on things like watching television, and in January 2024, he reported trouble concentrating more than half the days. AR 1379, 1485. At his first appointment with NP Williams in April 2023, he reported worsening memory and concentration over the last few years. AR 739. In February 2024, when meeting with NP Williams to complete his disability paperwork, he reported many issues concentrating. AR 1455. NP Williams's objective examinations during the relevant time period reflected intact memory (although not formally tested). AR 732, 743, 1436, 1442, 1457, 1525, 1535.

The category of understanding, remembering, or applying information "refers to the abilities to learn, recall, and use information to perform work activities," including:

> Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.[30]

In determining Plaintiff suffered only mild limitations in this category, the ALJ acknowledged Plaintiff's use of reminders (from his wife and in writing) but also relied on Plaintiff's normal memory testing in June 2021 and intact memory on objective examinations. AR 14. Plaintiff argues that the ALJ misconstrued the June 2021 testing by failing to acknowledge that the provider recognized Plaintiff's mental-health symptoms might cause his memory and concentration issues and suggested use of reminders and a structured routine. The ALJ discussed the test in only a single line; later in the opinion, the ALJ acknowledged some of the neuropsychologist's conclusions relied upon by Plaintiff. AR 14, 17. I disagree with Plaintiff that the neuropsychologist's opinion

---

[30] **20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)** (2024); *see also* **20 C.F.R. § 404.1520a(c)(3)**.

necessarily supports a finding of more than mild limitations in understanding, remembering, or applying information.  Plaintiff also argues that the ALJ erred by failing to explicitly note NP Williams stated Plaintiff's memory was not formally tested at her appointments.  That NP Williams observed nothing out of the ordinary with Plaintiff's memory provides some support for the ALJ's finding, even if she did not employ formal memory testing.

The ALJ also found Plaintiff suffered only mild limitations in the category of concentrating, persisting, or maintaining pace, which "refers to the abilities to focus attention on work activities and stay on task at a sustained rate" and includes:

> Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.[31]

The ALJ noted that although Plaintiff reported problems with concentrating and paying attention, he was able to read and watch television daily, prepare his own meals, perform house and yard work, drive a car, and shop, and providers noted normal attention span and concentration on objective examination.  AR 14; *see* AR 759, 813-14, 816, 830, 869, 936, 1229 (normal attention span noted at psychiatric medication management appointments in 2020, 2021, and 2022).  Plaintiff notes his need for reminders, which the ALJ discussed in determining Plaintiff's memory issues (which is a better fit).  Plaintiff also argues that the ALJ erred by failing to acknowledge his inability to manage bills.  But the other evidence relied upon by the ALJ—in addition to Plaintiff's ability to complete college and work two different full-time jobs, despite his complaints of trouble focusing—supports the ALJ's conclusion.

---

[31] *Id.*

The ALJ also found Plaintiff suffered only mild limitations in the category of adapting or managing oneself.

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting[, and] . . . . includes [r]esponding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.[32]

The ALJ acknowledged Plaintiff reported difficulties with changes in routine, but not with handling stress. AR 14. The ALJ also relied on Plaintiff's good insight and judgment on objective examination. *Id.* The ALJ noted that although Plaintiff reported needing assistance and reminders for personal care, objective examinations always revealed good grooming and hygiene. *Id.* Contrary to Plaintiff's arguments otherwise, the ALJ could credit objective examinations in the treatment records over Plaintiff's and his wife's reports when attempting to obtain benefits. Plaintiff argues that the ALJ ignored objective examinations from telehealth appointments in which NP Williams observed Plaintiff to be lying in bed (in April 2024) and shirtless (in June 2024), but a telehealth appointment is different than presenting in person (or to work) in that manner. AR 1523, 1533. In addition, Plaintiff argues that his need for assistance from his VA caseworker to get treatment approved supports adaptive limitations, but I disagree that difficulties navigating the bureaucratic red tape of VA benefits necessarily supports more than mild limitations in this category.

Finally, Plaintiff argues the ALJ erred in finding him only mildly limited in interacting with others. Treatment notes from December 2012 through the first half of 2013 reflect Plaintiff reported increased irritability and anxiety around large groups of people. AR 387, 402, 406, 408, 482, 499, 552, 554. He reported suffering a panic

---

[32] *Id.*

attack at a crowded football game in November 2012, prior to starting any mental-health medications. AR 558. He indicated he was easily frustrated by people's stupidity, and a provider observed him glancing at the door anytime someone walked down the hall during an appointment. AR 482, 531. In May 2018, he reported being in the process of obtaining a service dog. AR 375-77, 469. In September 2018, Plaintiff stated he had recently been suffering increased irritability and anxiety in crowds, although he noted he still felt better than when he first returned from Afghanistan in 2011. AR 378-79. At appointments in 2018 and 2020, he reported spending most of his time at home when he was not at work. AR 431, 933. When he started his new job in veterans outreach, he requested an accommodation note from his mental health provider so that he could bring his service dog to work, which was provided. AR 900. When applying for caregiver funding from the VA in April 2021, Plaintiff stated that he did not grocery shop; that he felt anxiety when visiting busier parts of national parks; and that his wife planned activities with his friends and encouraged him to leave the house. AR 834-35. In June 2021, he reported an eight-year history of increased isolationism that had improved over the last two years with the help of his service dog. AR 823. In December 2021, he reported his service dog was "extremely helpful" in managing his PTSD. AR 805. In June 2022, he reported "emotional exhaustion" after giving a presentation at work and suffering social anxiety, and he noted he had to call in sick the next day because he was so fatigued (his provider prescribed propranolol to use as needed for social anxiety). AR 755-56. In January 2023, he reported his service dog was extremely helpful, and his primary care provider noted his PTSD was stable with medications and use of his service dog. AR 753. In March 2023 (after he stopped working), he told his psychotherapist he would like to work on "his avoidant behavior and intensity to withdrawal from everyday life." AR 1203. In April 2023, when establishing care with NP Williams, he explained he suffered hypervigilance and difficulties going out in public, improved with his service dog, but he denied panic attacks and noted his PTSD symptoms were not all-encompassing like they had been in the past. AR 739. Later that month, he reported

24

suffering increased anxiety at larger grocery stores or crowded areas; but he made it a point to face his fears and shop in crowded stores at least once a week. AR 1192. He also noted he was working to sell his homemade mead at farmer's markets. *Id.* In July 2023, he stated his anxiety was well controlled, but worse in public and worse than before having a baby. AR 730. He reported feeling more irritable if he was in pain but not otherwise. AR 1184. In early January 2024, he reported being audited and suffering increased stress, anxiety, and irritability, such that he could not even leave his house to work on making mead in the backyard; his provider adjusted his medications, and two weeks later, he reported doing much better (even though he still had not left his house). AR 1434, 1440, 1482-83. In February 2024, he denied suffering anxiety when at home, but he continued to report increased irritability. AR 1454, 1460. He reported feeling on edge attending an event at his preteen's school recently. *Id.* His provider noted isolation could worsen mental health in the long run and encouraged him to leave the house, reminding him that he could use quetiapine as needed. AR 1454-55, 1460. In April 2024, he reported feeling awful (he was currently suffering a migraine), irritable, and short with people, noting he had recently been out of the house more than he would like. AR 1522. Recent stressors included the death of his grandfather and a friend, as well as issues with his mead-making business. AR 1523. In June 2024, he continued to report feeling irritable all the time, but he noted he "made it through" the day at a Renaissance festival with his service dog. AR 1532. He noted recent success with his mead-making business causing increased stress. AR 1533. Many treatment notes after 2019 reflect that Plaintiff brought his "service dog" (sometimes called a "therapy dog" or "emotional support dog") to the appointment. AR 996, 1005, 1115 (2019 therapy notes); AR 864 (February 2021 physical therapy note); AR 784, 1617 (2022 headache notes); AR 739, 1191, 1203, 1210, 1532 (2023 and 2024 mental health notes).

In evaluating a claimant's ability to interact with others, the ALJ must consider "abilities to relate to and work with supervisors, co-workers, and the public," including:

cooperating with others; asking for help when needed; handling conflicts with others; stating your own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.[33]

The ALJ found Plaintiff mildly limited, noting that although he reported irritability and issues getting along with people, function reports reflected he worked well with authority figures and had never lost a job due to issues getting along with people. AR 14. The ALJ additionally noted providers observed him to be pleasant, calm, and cooperative during the relevant time period. AR 14, 731, 743, 1192, 1442, 1456-57, 1525, 1535, 1627.

Plaintiff argues that the ALJ ignored the numerous references to Plaintiff's use of a service dog or emotional support dog.[34] The Commissioner does not respond to this argument, making no mention of Plaintiff's use of a service dog. The use of a service dog may establish more than mild limitation in social functioning, if the ALJ should have included such use in the RFC. District courts have held that an ALJ errs in failing to include the use of a service dog in the RFC only when two requirements are met. First, there must be evidence a medical provider prescribed or at least recommended use of a service dog to aid in workplace functioning.[35] Second, treatment records must support

---

[33] *Id.*

[34] A service dog is defined by the Americans With Disabilities Act (ADA) as a dog "trained to do work or perform tasks for the benefit of an individual with a disability," for example, "helping persons with psychiatric . . . disabilities by preventing or interrupting impulsive or destructive behaviors." *Tiffany B. v. Kijakazi*, No. 1:20-cv-02696, 2022 WL 224817, at *4 n.5 (S.D. Ind. Jan. 26, 2022) (quoting *Riley v. Bd. of Comm'rs of Tippecanoe Cnty.*, No. 4:14-CV-063, 2017 WL 4181143, at *5 (N.D. Ind. Sept. 21, 2017)). "Work or tasks" (for purposes of being a "service animal" under the ADA) does not include the "deterrent effects of an animal's presence and the provision of emotional support, wellbeing, comfort, or companionship." *Id.* (quoting *Riley*, 2017 WL 4181143, at *5).

[35] *Kimberly S. v. Comm'r, Soc. Sec.*, No. CV EA-23-1404, 2024 WL 5007372, at *4 (D. Md. Dec. 3, 2024) (substantial evidence supported ALJ's conclusion that plaintiff did not need a

26

that the claimant was accompanied to appointments by a service dog or otherwise utilized a service dog out in public.[36]

---

service dog at work when plaintiff's "psychologist stated that a service dog 'would be beneficial,'" but no provider "prescribed a service dog or . . . found one to be necessary for her to work"; and record also lacked information on when dog "began providing services, what services he provides, and for what specific condition" (other than plaintiff's testimony that dog helped her leave the house and sensed when she was about to have a panic attack)); *McGehee v. Berryhill*, 386 F. Supp. 3d 80, 83, 88 (D. Mass. 2019) (ALJ did not commit reversible error in failing to discuss claimant's use of a service dog when determining RFC, even though medical records showed plaintiff "was often accompanied by her service dog when she left her home," since "there is no evidence in the record that she had a prescription for the dog[] or even a letter from a medical source recommending a dog," as well as "no evidence that her service dog has been certified"; court also relied on ALJ's step two finding of inconsistencies regarding plaintiff's ability to leave the house without her service dog, as reflected in treatment notes where claimant sometimes presented to appointments with her dog but sometimes did not); *Tiffany B.*, 2022 WL 224817, at *5-6 (letter stating provider was "in favor of a service dog for [claimant] to provide emotional comfort and support due to PTSD," prepared for claimant's landlord so that claimant could keep her dog at home, "fail[ed] to medically prescribe such an animal or provide an opinion on the impact of a service animal on [claimant's] ability to work"); *cf. Rentfro v. Colvin*, No. 14-cv-3015, 2015 WL 12868081, at *13 (C.D. Ill. Oct. 21, 2015) (holding that ALJ erred in relying on lack of a prescription for service dog when treatment record reflected that a mental health provider wrote under "other orders" "Therapy—Service Dog," and other treatment records reflected plaintiff's use of a service dog), *report and recommendation adopted*, 2016 WL 3360463 (June 16, 2016) (clear error review).

[36] *Trea N. L. v. O'Malley*, No. 4:23-cv-04064, 2025 WL 2429032, at *5-6 (S.D. Tex. Mar. 20, 2025) (ALJ did not err in failing to mention service dog, despite provider's letter that service dog was "'medically necessary' to alleviate [p]laintiff's limitations in social interaction, coping with stress and anxiety, and functioning independently," when no other evidence supported plaintiff's use of a service dog); *Tiffany B.*, 2022 WL 224817, at *6 (noting treatment notes did not reflect use of a service dog); *Cordell v. Saul*, No. 3:19-CV-47, 2019 WL 6257994, at *18-19 (N.D.W. Va. Nov. 4, 2019) (no error in failing to consider use of service dog in RFC when only evidence of service dog was plaintiff's statements to Social Security Administration and "a letter to a landlord" from plaintiff's medical provider "that [p]laintiff has limitations which would require [p]laintiff's service dog to live with him pursuant to the Americans With Disabilities Act"), *report and recommendation adopted*, 2019 WL 6255498 (Nov. 22, 2019) (clear error review); *Lonsdorf v. Berryhill*, No. 4:16-CV-1868, 2018 WL 6179534, at *6 (E.D. Mo. Nov. 27, 2018) (ALJ did not err in failing to evaluate Plaintiff's need for a service dog when doctor's note stated plaintiff "would benefit from a service dog," but later medical records made no mention of plaintiff using dog for assistance; court also noted dog had been a family pet for five years before undergoing service dog training); *Payano v. Colvin*, No. 2:15-cv-00294, 2017 WL 4778593, at *4 (D. Nev. Oct. 23, 2017) (letter from psychiatrist "recommend[ing] that

Both these requirements are met here. Although there is no evidence that Plaintiff's providers originally suggested or prescribed a service dog, Plaintiff's psychiatric provider did complete a form in 2020 stating Plaintiff needed to bring his dog to work. AR 900. And the record is replete with references to Plaintiff's use of a service dog, both observed by providers at appointments and reflected in Plaintiff's statements to his providers about his functioning and daily activities. Under the circumstances, the ALJ should have discussed Plaintiff's use of a service dog somewhere in the opinion.[37] But any error is harmless because the ALJ ultimately found Plaintiff could return to his past work as a career information specialist as actually performed, and his past work accommodated his use of a service dog.[38]

Overall, here, the treatment records reflect that Plaintiff suffers some issues with being around people, memory, and concentration. But they also support that Plaintiff has been suffering these issues for a long time, and he was able to maintain full-time (skilled) employment despite these complaints. Treatment records do not support that his

---

[claimant's] dog be designated a service animal to accompany her when out in public to provide support and stress relief," standing alone, did not require ALJ to include use of a service animal in claimant's RFC); *see also **Dennis B. v. Comm'r of Soc. Sec.***, No. 2:21cv612, 2023 WL 2646303, at *2-3 (E.D. Va. Mar. 27, 2023) (adopting report and recommendation) (substantial evidence supported ALJ's finding unpersuasive doctor's note stating service dog was "medically necessary," in part based on no treatment records reflecting service dog accompanied plaintiff to appointments).

[37] *See **Santos v. Colvin***, No. 3:12-cv-05827, 2013 WL 5176846, at *5-6 (W.D. Wash. Sept. 12, 2013) (holding that ALJ erred in failing to discuss use of a service dog in RFC assessment when treatment records reflected "plaintiff's use of a service dog has been of significant benefit to him in terms of his mental health symptoms," and although "not originally prescribed for him," a doctor "did provide a 'letter' for one at plaintiff's request").

[38] ***Kimberly S.***, 2024 WL 5007372, at *5 (noting that when determining whether jobs exist the claimant can perform, the ALJ generally "does 'not consider whether the claimant could do so with accommodations, even if an employer would be required to provide reasonable accommodations' under the ADA," except when "a claimant's former employer 'actually made the accommodation' in a past job" and the ALJ is considering "whether the claimant can perform that past work as it was 'actually performed'" (cleaned up) (quoting **Social Security Ruling (SSR) 11-2p**, 76 Fed. Reg. 56263, 56266-67 (Sept. 12, 2011))).

28

mental health worsened at the time of his alleged onset date. Instead, as the ALJ noted, it appears Plaintiff stopped working due to the birth of his daughter. Plaintiff's mental health has largely remained stable since 2018. The ALJ could therefore find that Plaintiff's mental impairments caused no more than minimal limitations in his ability to function in the workplace, since Plaintiff was able to function in the workplace despite his impairments (other than needing to use a service dog, which is harmless error, as already discussed). The ALJ did not err by failing to include other mental limitations in Plaintiff's RFC (such as related to his ability to concentrate, remember, or be around people, since he was able to do these things at work despite his impairments).

I recommend finding that the ALJ's step-two determination is largely supported by substantial evidence, and any error in failing to include Plaintiff's use of a service dog in Plaintiff's RFC is harmless.

### C. Lack of Evidence How Plaintiff's Past Work Was Actually Performed

At step four, the ALJ determines whether the claimant can perform his past work as actually or generally performed. Here, the ALJ found that Plaintiff could perform his past work as actually but not generally performed.[39] Plaintiff argues that the ALJ failed to adequately develop the record on how Plaintiff actually performed his past work. Therefore, Plaintiff argues that the ALJ's step-four finding is not supported by substantial

---

[39] The ALJ found at step five that other jobs existed in the national economy Plaintiff could perform. These alternative findings do not save any error at step four, however, because of my harmless-error analysis in the previous section regarding Plaintiff's use of a service dog (which depended on his ability to return to his past work). *Cf. Caldwell v. Barnhart*, 84 F. App'x 714, 715 (8th Cir. 2003) ("[E]ven if the ALJ's finding as to past relevant work [was error], it was at most harmless error, as the ALJ alternatively found that [plaintiff] could perform the jobs the VE identified as existing in the national economy."); *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007) (remand not required by ALJ's failure to make explicit findings regarding the demands of plaintiff's past work as actually performed, since "nothing in [plaintiff's] RFC affects her ability to perform" her past work as described in the *Dictionary of Occupational Titles*).

evidence.

The regulations provide that at step four, the ALJ must compare the claimant's RFC "with the physical and mental demands of [the claimant's] past relevant work."[40] They require the Social Security Administration to ask the claimant for information about his past work but also allow consultation with "other people who know about [the claimant's] work," VEs, or resources such as the Dictionary of Occupational Titles (DOT).[41] The Eighth Circuit has adopted Social Security Ruling (SSR) 82-62, which requires "[a]dequate documentation of [the demands of] past work . . . which have a bearing on the medically established limitations" in the RFC; the Social Security Administration must obtain "[d]etailed information about strength, endurance, manipulative ability, . . . and other job requirements . . . as appropriate," as well as "a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc.," for claims involving a mental impairment.[42] SSR 82-62 notes that the claimant is the primary source for the vocational requirements of past work and that the ALJ must carefully consider "the individual's statements as to which past work requirements can no longer be met" and why; but also recognizes that the ALJ may consult other sources such as employers or the DOT "on the requirements of the work as generally performed in the economy."[43] The Eighth Circuit requires the ALJ to "fully investigate and make *explicit* findings as to the physical and mental demands of a

---

[40] **20 C.F.R. § 404.1520(f)**.

[41] **20 C.F.R. § 404.1560(b)(2)**. This language was added in 2003. *Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations*, **68 Fed. Reg. 51153**, 51157 (Aug. 26, 2003).

[42] *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting **SSR 82-62**, 1982 Soc. Sec. Rep. 809, 811-12 (Jan. 1, 1982)).

[43] **SSR 82-62**, 1982 Soc. Sec. Rep. 809.

claimant's past relevant work" to compare to the claimant's RFC.[44]

Plaintiff argues the ALJ failed to develop the record and make explicit findings as to the vocational requirements of his past work. The only forms in the record regarding Plaintiff's past work ask about his dates of employment, hours, income, and "duties performed" (to which he responded with his job title). AR 259-60, 323.[45] At the hearing, Plaintiff explained that his job involved "mostly getting in touch with veterans" and "helping them figure out what resources are available to them," acting as a "gateway to other people" with more information. AR 35. When asked if his job involved lifting, he said, "[s]ome, but very rarely," and estimated that he lifted "[t]en pounds, maybe once a month." *Id*. He testified that he stopped working due to migraines. AR 36. The VE needed additional information to classify his past work and asked Plaintiff how much time was spent standing or walking when he worked with veterans. AR 58. Plaintiff responded that he had his own office and could do 90% of his job from a seated position. *Id*. Based on his testimony, the VE classified Plaintiff's past work as a "career information technician or specialist," "DOT [Number] 249.367-014." AR 59. The VE testified that a hypothetical person with claimant's RFC could return to his past work as actually performed at the sedentary level (but not as generally performed at the light level). AR 60.

The regulations specifically provide that a VE "may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally

---

[44] *Groeper*, 932 F.2d at 1238.

[45] There is a page on one of the forms asking for specific details (such as the time spent sitting, amount of weight lifted, etc.), but it directs the claimant to skip this part if he had more than one job in the last fifteen years (which Plaintiff did). AR 260. Treatment records reflect some information about Plaintiff's past work, that he reported using written reminders at work (AR 823) and that he gave a presentation to others at work and would be doing more public speaking in a month (AR 755-56).

31

performed in the national economy."[46]  The Eighth Circuit has thus held that an ALJ satisfies the duty "to develop the record [and] make explicit findings regarding the mental and physical demands of . . . past relevant work . . . . 'by referring to the specific job descriptions in the [*DOT*] that are associated with the claimant's past work.'"[47]  Here, the VE and ALJ identified the DOT number associated with the claimant's past work, and the ALJ relied on the VE's expertise of the demands associated with that work.  The ALJ did not need to develop the record any further.

The cases relied upon by Plaintiff are all distinguishable.  In *Groeper* and *Nimick*, the ALJs did not rely on VE or DOT evidence and instead found claimants could return to their past work based only on forms they completed that did not ask about the mental demands of that work.[48]  In *Samons*, the Eighth Circuit held that any error in failing to make "'explicit findings' as to the demands of [claimant's] past relevant work" was harmless because the DOT description of one of the past jobs supported that claimant could perform it.[49]  And in *Lowe*, the ALJ's finding that claimant could return to her past work conflicted with both the DOT and the opinions of two VEs, which all supported that claimant's past work required the repetitive use of her hands (and the ALJ found plaintiff could not perform work requiring the repetitive use of her hands).[50]

Plaintiff does not make any specific arguments regarding what aspects of his past work would be precluded by his RFC.  Plaintiff testified at the hearing that he could not

---

[46] **20 C.F.R. § 404.1560(b)(2)**.

[47] *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013) (quoting *Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999)); *see also* **Grable v. Colvin**, 770 F.3d 1196, 1202 (8th Cir. 2014) (the ALJ makes findings as to the physical and mental demands of past work by eliciting VE testimony "explain[ing]" the duties of past work "in view of" information provided by the claimant about that work).

[48] *Groeper*, 932 F.2d at 1239; *Nimick v. Sec'y of Health & Hum. Servs.*, 887 F.2d 864, 867 & n.4, 868 (8th Cir. 1989).

[49] *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007).

[50] *Lowe v. Apfel*, 226 F.3d 969, 973-74 (8th Cir. 2000).

perform his past work due to migraines. He argues now that he would miss work and that the limitations found by NP Williams show he could not perform his past work. The ALJ did not include limitations related to missing work or as found by NP Williams, and I have already found substantial evidence supports this decision.

I recommend finding that the ALJ did not err in developing the record regarding Plaintiff's ability to perform his past work.

## III.    CONCLUSION

I recommend **affirming** the Commissioner's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[51] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[52]

**DATED** January 7, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[51] **Fed. R. Civ. P. 72**.

[52] *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).