# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JOSHUA D.,[1]

        Plaintiff,

vs.

FRANK BISIGNANO,
Commissioner of Social Security,

        Defendant.

No. C24-2056-LTS-KEM

**MEMORANDUM
OPINION AND ORDER**

## I.    INTRODUCTION

This case is before me on a Report and Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge. Doc. 13. Judge Mahoney recommends that I affirm the decision of the Commissioner of Social Security (the Commissioner) denying an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, filed by plaintiff Joshua D. (the Claimant). The Claimant has filed a timely objection. Doc. 14. Oral argument is not necessary. LR 7(c).

## II.    APPLICABLE STANDARDS

### A.    *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). "Substantial

---

[1] For privacy reasons, I refer to Social Security claimants by their first name and last initial, as recommended by the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

To determine whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). That means considering both the evidence that supports and detracts from the Commissioner's decision. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court "must search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

The court applies a balancing test to assess any contradictory evidence in an appeal of a denial of benefits. *Sobania v. Sec'y of Health & Hum. Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555, or "review the factual record de novo," *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). Instead, if, after reviewing the evidence, the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even if the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an

2

opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## B.      *Review of Report and Recommendation*

A district judge reviews a magistrate judge's R&R under the following standard:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, whenever a party objects to a portion of an R&R, the district judge must undertake a de novo review of that portion.

The unobjected to portions of an R&R are still reviewed under at least a "clearly erroneous" standard. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). A district judge may however elect to review an R&R under a more exacting standard even without an objection.

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

3

### III. DISCUSSION

I incorporate the extensive recitation of the factual history set forth in the R&R, to which the Claimant did not object. *See* Doc. 13 at 1-8; Doc. 14. In short, the Claimant filed for disability insurance benefits in May 2023, alleging an onset date of February 10, 2023. AR 71. He asserts that a host of ailments prevent him from performing substantially gainful activity (SGA), describing migraines as the most debilitating but also sleeping issues, depression, social anxiety, traumatic brain injury (TBI), gastroesophageal reflux disease, tinnitus and physical limitations to his knees, right shoulder and lower back. AR 37, 71.

An administrative law judge (ALJ) held a hearing in July 2024, at which the Claimant was represented by counsel and a vocational expert (VE) testified. After the hearing, the ALJ applied the familiar five-step evaluation[2] and determined that the Claimant was not disabled as defined by the Social Security Act. AR 10–23. In so doing, the ALJ found: (1) Claimant was not engaged in SGA; (2) pain to the Claimant's back, knees and shoulder was severe, but his headaches and mental impairments were not; (3) the Claimant's impairments, singly and combined, did not meet any listed disability; (4) the Claimant had a residual functional capacity (RFC) to perform light work (excepting some physical limitations) and therefore could return to his past relevant work as a veteran career planner; and (5) the Claimant could otherwise adjust to working as an

---

[2] The Commissioner must evaluate:

    (1) whether a Claimant is engaged in substantial gainful activity;

    (2) whether any claimed physical or mental impairments are "severe" as to significantly limit a Claimant's ability to perform basic work;

    (3) whether the severe impairments then fit within a presumptively disabling impairment listed in the regulations;

    (4) whether the Claimant's residual functional capacity allows him or her to perform past relevant work; and

    (5) whether there are other jobs in the national economy that the Claimant could perform.

20 C.F.R. §§ 404.1520, 416.920; *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

office helper, routing clerk and mail clerk. The Claimant argues that the ALJ erred by finding at step two that his migraines and mental impairments were not severe and by not properly incorporating those impairments into the step four and step five analyses.

At step two, an ALJ determines whether each of a claimant's alleged impairments is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [a claimant's] physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). This is not a particularly onerous standard to meet, but neither is it "toothless." *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007).

When any single impairment is found to be severe, the ALJ will proceed to step three and consider whether the claimant's impairments meet or equal a listing of conditions that are conclusively disabling. 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). If not, the analysis continues to step four, at which the ALJ is tasked with determining a claimant's RFC, otherwise known as "the most a person can do despite that person's limitations. *Brown v. Barnhart*, 390 F.3d 535, 538–39 (8th Cir. 2004) (citing 20 C.R.F. § 404.1545(a)(1)). The ALJ then must decide whether the claimant's RFC allows him or her to return to past relevant work, 20 C.F.R. § 404.1520(f), and determine at step five whether the RFC prevents the claimant from adjusting to other vocations. *Id.* § 404.1520(g).

When determining a claimant's RFC, an ALJ must consider every alleged impairment, regardless of whether it was labeled severe at step two. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, a claimant's RFC "should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017); *accord Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). Because an ALJ need only find one impairment severe to proceed to the next steps, step two serves a gatekeeper function "designed to weed out individuals whose impairments are so minimal that they cannot possibly meet the statutory definition of disability." *Claimant v. Kijakazi*, No. 22-cv-3230, 2023 WL 8242727, at *3 (D. Minn. Nov. 3,

5

2023) (citing *Bowen*, 482 U.S. at 156 (1987) (O'Connor, J., concurring)); *accord Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). Consequently, misclassifying an impairment at step two could be harmless at step four if the ALJ gave the impairment its due regard in the sequential process.[3]

As discussed above, the ALJ considered the Claimant's migraines and mental impairments non-severe at step two but found other impairments severe. Because an error at step two may be harmless depending on the ALJ's later analysis, and an impairments severity and claimant's RFC both ostensibly look to the effect an impairment has on a claimant's work function, I will analyze the Claimant's step two and four objections together.

### A.   *Migraines*

The ALJ found the Claimant's migraines to be non-severe because they were controllable with medication. AR 13; *see also Phillips v. Colvin*, 721 F.3d 623, 631 (8th Cir. 2013) (impairments sufficiently managed with treatment are not severe). The ALJ explained:

> [T]he record revealed the claimant's headaches were adequately treated
> with Nurtec. The severity of his headaches was dramatically less. (Exhibit

---

[3] Some courts interpret *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), to hold that an error at step two is per se reversible error. *See Lund v. Colvin*, No. 13-cv-113, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (collecting cases). I disagree, as do some other judges throughout the circuit. *See, e.g.*, *Jorge M-C. v. Bisignano*, No. 24-cv-3030, 2025 WL 2491197, at *8 n.47 (N.D. Iowa Aug. 29, 2025); *Havel-Sturdevant v. Kijakazi*, No. 22-cv-20, 2023 WL 11158981, at *11 (S.D. Iowa May 25, 2023); *Chrzanowski v. Kijakazi*, No. 21-cv-29, 2022 WL 1749830, at *5 (D.N.D. Mar. 8, 2022); *Kroger v. Astrue*, No. 11-cv-4012, 2012 WL 472900, at *12 (D.S.D. Feb. 13, 2012); *Jane P. F. v. Kijakazi*, No. 22-cv-3112, 2023 WL 9197937, at *4 (D. Minn. Oct. 2, 2023); *Maune v. Berryhill*, No. 17-cv-1479, 2018 WL 4333550, at *5 (E.D. Mo. Sept. 11, 2018); *Greenemay v. Astrue*, No. 10-cv-4254, 2011 WL 3876307, at *5 (W.D. Mo. Aug. 30, 2011); *Hill v. O'Malley*, No. 22-cv-304, 2024 WL 2019622, at *5 (E.D. Ark. May 7, 2024); *Richardson v. Kijakazi*, No. 22-cv-2170, 2023 WL 8441337, at *9 (W.D. Ark. Nov. 6, 2023).

19F, p.5). The claimant indicated that with Nurtec, he was down to one migraine in the last two months. (Exhibit 20F, p. 1).

AR 13. This has support in the record, as many of the improvements in the Claimant's migraines were attributed to the drug. *See, e.g.*, AR 747 ("[Nurtec] has been a game changer in reducing his headaches and if he misses a dose he will get a headache."), 753 ("Migraines significantly improved since starting [Nurtec]."), 784 ("[Claimant] has found the Nurtec tolerable and effective."), 1615 ("[T]he Nurtec usually aborts his headaches, so he is doing so much better."), 1616 ("[Claimant] has found the Nurtec quite helpful and the severity of his headaches is dramatically less."), 1626 ("Patient reports that he got his symptoms relatively well-controlled where he was taking Nurtec routinely 2 times per week and that would significantly reduce his migraines.").

Unfortunately, the Claimant began to have difficulties accessing Nurtec while his disability claim was pending. For example, in notes from an August 2023 session, the Claimant's headache specialist remarked how Claimant's headaches had been improving up until then, but trouble filling the prescription had led to him "breaking through several times per week." AR 1612. The specialist strategized "resubmit[ting] for Nurtec again through [Claimant's] wife's insurance" so the Claimant could regain access to the drug. *Id.* This, he hoped, "will help [the Claimant's] headaches as it did last time he was on the drug." *Id.* By the time of the Claimant's discharge, the doctor noted that Claimant was "back using Nurtec again, which [he] hope[d] would be helpful." AR 1613.

Coverage problems reemerged in March 2024, with the Claimant's headache specialist writing that his insurance was mandating he be seen by a board-certified neurologist before it would agree to refill the Nurtec prescription. AR 1622. In the meantime, the Claimant's migraines were "transitioning back to episodic headaches" that the Claimant could still tolerate "fairly well" with Nurtec used abortively. AR 1625. The Claimant was referred to a neurologist "so he can refill his Nurtec and continue his regimen," with his headache specialist reporting that the Claimant had enough Nurtec to

7

"get by" until such appointment. AR 1622, 1625. At that time, the Claimant had reportedly needed Nurtec only once over the past month while only experiencing one or two headaches. AR 1622. In an April visit with his psychiatrist, however, the Claimant reported he was experiencing increased migraines due to his inability to refill his Nurtec and that he wanted his "medication renewed as soon as possible as it significantly improves preventing his migraines." AR 1528.

The Claimant was seen by a neurologist in June 2024. AR 1626. He reported needing to see neurology to get his prescription, with the doctor stating that she would "try to get this Nurtec for him the best that [she] can" but warning that his insurance would not necessarily resume coverage despite him seeing her. AR 1626. Ultimately, it appears that the Claimant's insurance still refused to cover the drug. AR 1558–59.

In the July 2024 hearing before the ALJ, the Claimant stated that he still could not get Nurtec and then testified as follows:

> Q   So, how often are you having migraines?
> A   I get them two to three times a week without medication.[4]
> Q   And when you say without medication, does that mean you don't have any medication?
> A   I have some still from my doctor giving me sample—a sample pack. But without medications, two to three times a week.
> Q   So, you have these samples for right now. Are you still getting migraines two to three times a week?
> A   Not with them, but I have less than a month's worth of them left, so.
> Q   Okay. When you do get a migraine, when's the last time you think you had a migraine?
> A   I had one last month. I had one that the pill didn't work on last month. But normally, when I have the medication, it's like a medical drug. They take them away.
> Q   When you have a migraine—let's take the one that you had last month. Can you tell when it's coming on?
> A   Yeah, but I only have about two to three minutes before it hits.

---

[4] The referenced medication was Nurtec.

8

Case 6:24-cv-02056-LTS-KEM    Document 15    Filed 03/19/26    Page 8 of 24

Q      So, what do you notice when it's coming on?

A      It feels like there's a lot of pressure in my head, and I start to get sharp pain, and my eyes hurt, and a little blurry. And then after that, an emergency pill I can take (INAUDIBLE) 15 minutes if I need to get off them or something.

Q      Like if you're driving?

A      Yeah. And then after that, it's kind of—it all hits at once, and I can't do anything, so.

Q      So, how long are you unable to do anything once it sets off?

A      At a minimum several hours. It can be up to 48 hours, though.

. . . .

Q      Okay. During that 48-hour period that you're out, what do you have to do? Where are you at?

A      I'm in my bed under the blankets with an ice pack and that's about it.

Q      You can't function at all?

A      No.

AR 37–39; *see also* AR 1626 (the Claimant's report to the neurologist that his migraines "will last 2+ days" without Nurtec).

The ALJ's written findings did not question the potency or frequency of the Claimant's reported migraines when off Nurtec. Instead, the ALJ found Nurtec "adequately treated" the Claimant's migraines to render them non-severe. AR 13. Thus, when weighing the effect of the Claimant's migraines on his RFC, the ALJ found the impairment was minimal. He wrote:

> [I]n June 2024, the claimant was seen by neurology for migraine headaches. The claimant noted he had had migraines for many years and his symptoms were relatively well-controlled with Nurtec. However, his insurance was going to cease coverage of Nurtec unless the claimant was seen by neurology. . . . Neurology continued the claimant on Nurtec. (Exhibit 20F; *see also* Exhibit 19F).

AR 16.

The problem, of course, is that at the time of the ALJ's hearing, it was unclear if the Claimant would be able to obtain Nurtec in the future. During the hearing, which took place on July 22, 2024, the Claimant testified that he had "less than a month's worth" of Nurtec remaining. AR 37. In addressing this issue, Judge Mahoney concluded that the ALJ did not err because he was required to focus only on the "relevant time period." Doc. 13 at 18. While that is correct, the relevant time period for considering a claimant's alleged disability does not end on the date of the ALJ's hearing. Instead, it runs through the date of the ALJ's decision. *See, e.g.*, *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citing 20 C.F.R. § 404.620).

Here, the ALJ's decision was issued August 30, 2024, more than a month after the hearing. AR 23. Thus, it is quite possible that Nurtec—the medication the ALJ relied on to find that the Claimant's migraines were not a severe impairment—was no longer available to the Claimant before the end of the relevant time period. The ALJ did not address this possibility in his decision, nor did he request further development of the record as to the outcome of the Claimant's efforts to obtain additional supplies of Nurtec.

Given the significant role that the beneficial effects of Nurtec had on the ALJ's analysis at both step two and step four, I find that the ALJ erred and that the error was not harmless. I will therefore order remand with directions that the ALJ develop the record further as to (1) whether the Claimant had an adequate supply of Nurtec through August 30, 2024, and, if not, (2) whether the ALJ's findings as to the Claimant's RFC would change without the availability of Nurtec.[5]

---

[5] Judge Mahoney noted that other medications were available to treat the Claimant's migraines. Doc. 18 at 13. On remand, the ALJ is free to consider and address the availability of other medications if the ALJ determines that the Claimant did not have access to an adequate supply of Nurtec through the end of the relevant time period.

## B.   *TBI, PTSD, Depression, Social Anxiety and Other Mental Impairments*

The severity of mental impairments is measured in four broad areas: (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; (3) adapting or managing oneself; and (4) interacting with others. 20 C.F.R. § 404.1520a(c)(3).  When a claimant's impairments are rated "mild" in those categories, then they are generally not severe.  20 C.F.R. § 404.1520a(d)(1).  The ALJ found each of the Claimant's mental impairments, singly and combined,[6] were mild and otherwise had a minimal limitation on the Claimant's ability to do basic work.  AR 13.

Record evidence shows that the Claimant began exhibiting signs of mental impairments around 2012.  At that time, he was just returning from an overseas deployment, having been exposed to at least three improvised explosive device (IED) blasts while serving.  AR 530, 1104.  These explosions were later linked to his PTSD and TBI diagnoses.  *See* AR 40, 410, 559, 844, 1216.  Upon the Claimant's return, he reportedly struggled with his memory, apparently needing to carry a notepad everywhere and taking three to four pages of notes daily.  AR 506, 559.  He had also reenrolled in college (having completed two years before his deployment, AR 530), but withdrew soon after citing memory and concentration difficulties.  AR 409, 435, 531.  His social anxiety problems also started, reporting to doctors that he experienced flare-ups at a football game and at a mall that left him feeling trapped.  AR 514, 558.  The Claimant further

---

[6] Judge Mahoney noted that the ALJ did not consider TBI in reviewing mental limitations but found the omission to be harmless.  Doc. 13 at 19 n.27.  TBI was considered by the VA, in conjunction with "other specified trauma and stressor related disorder[s]," to be 70% disabling when determining Claimant's entitlement to VA disability benefits in December 2021.  AR 182. Although it would have been better for the ALJ to directly address TBI, his later rationale does appear to incorporate TBI into his analysis.  *See* AR 17 ("His cognitive profile was consistent with TBI.").  As VA determinations are accorded no conclusive effect, 20 C.F.R. § 404.1504, and the ALJ appears to have based his non-severity determination on objective evidence of Claimant's lifestyle rather than focusing on any singular diagnosis and how it affected his memory, I agree with Judge Mahoney that any potential omission is harmless.

11

reported hypervigilance in public and nightmares that kept him from sleeping.  AR 387, 514, 529.

The Claimant underwent his first neuropsychological evaluation in 2013 due to his mental condition.  AR 529.  The results suggested most of his cognition was average, but his "[d]elayed memory index was significantly lower," "consistent with problems described by [the Claimant]" such as his "difficulty remembering routine activities."  AR 532.  The Claimant was also formally diagnosed with PTSD, depression and TBI around the same time.  AR 545–46, 552, 559–60.

By 2019, the Claimant had obtained a service dog[7] that would become "extremely helpful" for managing his social anxiety, insomnia and PTSD.  AR 748; *accord* AR 44, 739, 753, 805, 823.  This period also saw the Claimant graduate college with a GPA "on the high end."  AR 823.  Despite these successes, the Claimant reported in 2021 that he had been experiencing "a 'substantial decrease' in [his] short-term memory" around the 2019 time and that was progressively getting worse.  *Id.*  He described an office that had to be "covered in post-it notes" and a reliance on a digital reminder system to augment his failing memory.  The Claimant also reported difficulty multitasking, forgetting appointments and education from doctors and that he relied on his wife to manage their bills, remind him to do household chores and take care of himself (taking medications, showering, grooming).  AR 823, 832, 914, 1298.

The Claimant's renewed memory struggles prompted a second neuropsychological evaluation in 2021.  AR 826.  The interpreting doctor opined that the Claimant's results

---

[7] There is some ambiguity whether the animal is a service or support dog, the difference being that a "service animal" is "individually trained to do work or perform tasks for" a disabled person under the Americans with Disabilities Act regulations, while a support dog merely provides companionship or emotional support to an individual. 28 C.F.R. § 36.104.  References to the Claimant's dog typically call it a service dog, *see, e.g.*, AR 43, 272, 469, 805, 1367, 1617, but at other times a variation of support dog is used, *see* AR 17, 327, 834, 1110, 1560. Since more references to the Claimant's dog describe it as a service dog and there is some suggestion the dog is trained to assist with the Claimant's impairments, *see* AR 43, 1374, I will refer to it as such.

suggested he had "a cognitive profile generally within expected limits, albeit subtle inefficiencies within visual memory, general recognition memory, and an isolated reduction on a verbal mental flexibility task." AR 826. In a section for recommendations, the evaluator stated the Claimant "may benefit from continued visual (e.g., written reminders) or auditory (e.g., alarms) cues," "a structured routine," and adhering to his CPAP to get better sleep.[8] *Id.*

The Claimant had reportedly been going to psychiatry appointments off-and-on since 2016. AR 1545. From April 2023 onward, he began seeing Bethany Williams, an advanced registered nurse practitioner, for such appointments. AR 738. At the Claimant's first appointment with Williams, he reported his concentration was getting "worse over the last few years," along with anxiety out of the house and PTSD-related hypervigilance. AR 739. Still, Williams' notes reflected her observation that the Claimant's memory was "[g]rossly intact" without having gone through formal testing, AR 743, which she would continue to report during their follow-up appointments. AR 732, 1436, 1442, 1456, 1525, 1535.

The Claimant and his wife both completed functional reports in 2023 related to the Claimant's application for disability benefits. Their reports were consistent. Both reported that the Claimant's wife paid the bills and discussed her significant role in reminding the Claimant to follow through with daily grooming (such as showering or eating) and chores. AR 267–68, 275–77. Although the Claimant would struggle to start tasks, when reminded he was able to mow the lawn, fold laundry, let the dog out, change diapers, and prepare simple meals like sandwiches or leftovers. AR 267–68, 275–76. Both stressed the Claimant's need for his service dog to always accompany him. AR 269, 271, 277. They also reported that his random irritability spells made it difficult to

---

[8] For context, Claimant historically has struggled to tolerate his CPAP machine, which would make it difficult to adhere to. *See, e.g.*, AR 735, 800, 875, 933, 1440. Though sometimes, doctor's notes suggested he might temporarily tolerate it. AR 844. This difficulty was accounted for by suggesting psychotherapy to also address his sleep problems. *See* AR 826.

13

get along with others.  AR 271–72, 278.  For hobbies, both stated that the Claimant would read and watch TV daily.  AR 270, 278.

Non-examining psychology consultants reviewed the Claimant's application in September 2023 and February 2024 respectively.  AR 73–74, 82–83.  They both categorized the Claimant's mental limitations regarding the four categories as "mild."  The same explanation buttressed their findings:

Claimant ADLs indicate that he completes a wide range of multi-step tasks on a daily and weekly basis.  These include self-care; care for his child; preparation of simple meals; and general housekeeping tasks.  Claimant reports he is able to go out alone, drive, shop, and manage money.  Claimant reports social interaction with others.  Claimant reports he is able to follow both written and spoken directions "fine."  Third party ADL (wife) is highly consistent.  Both note multiple areas of impairment secondary to physical health issues which will be assessed elsewhere in file.

VA MER 5/2021 notes neuropsych assessment.  Notes that a wide panel of testing was given due to claimant allegation of memory loss.  Results of testing were in the normal range.  Memory was noted to be intact.  Dx of PTSD and MDD noted.  No memory or cognitive issues or dx given.

VA MER per provider (ARNP) 1/2022 notes that "mood is stable and anxiety is low."  Notes "medications working well."  MSE intact.  MER 7/2022 notes that claimant was upset, found out yesterday a friend of his committed suicide.  This Standard exhibit with value exhibit number 4A on page 3 of 8 82 was processed. MSE intact.  MER 7/2023 notes that claimant notes mood was "good" and only had "mild" anxiety.  Notes, "overall he is doing well."  MSE notes that he was alert and oriented.  Notes that he was "upbeat and smiling."  Eye contact was good.  Speech was normal.  Thought content and process were normal.  Insight and judgment were good.  Memory intact.  Dx of PTSD and MDD noted.

Claimant's mental MDIs are MDD and PTSD.  Listings 12.04 and 12.15 were used in evaluating this claim.  Claimant allegations of impairment due to mental MDI are consistent, however claimant reports a

14

wide range of multistep ADLs performed on a daily basis despite MDI; difficulties in ADL are attributed to physical allegations. Claimant MDIs do not meet or equal listing criteria. The preponderance of the evidence indicates that mental MDIs impose no more than mild impairment to functioning and are considered non-severe at this time.[9]

*Id.*

In June 2024, Williams submitted her Mental Medical Source Statement on the Claimant's behalf, opining on his mental limitations. AR 1545–50. Responding to a question asking for clinical findings that demonstrate the severity of the Claimant's mental impairments, she wrote:

anxiety, depression, psychomotor agitation, irritable, tense, describes 'obsessional thoughts,' isolation—extreme difficulty leaving house—often unable to tolerate, low energy, low appetite, low motivation, little interest in activities

AR 1545. She next evaluated the Claimant's capacity for performing certain activities necessary to do unskilled work. Here, she found as follows:

---

[9] The only difference is that the February 2024 report states that the first analysis was persuasive, so no reconsideration was necessary. AR 83.

| I. | MENTAL ABILITIES AND APTITUDES NEEDED TO DO UNSKILLED WORK | Unlimited or Very Good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Remember work-like procedures | | | X | | |
| B. | Understand and remember very short and simple instructions | | X | | | |
| C. | Carry out very short and simple instructions | | X | | | |
| D. | Maintain attention for two hour segment | | | X | | |
| E. | Maintain regular attendance and be punctual within customary, usually strict tolerances | | | X | | |
| F. | Sustain an ordinary routine without special supervision | | | X | | |
| G. | Work in coordination with or proximity to others without being unduly distracted | | | | X | |
| H. | Make simple work-related decisions | | X | | | |
| I. | Complete a normal workday and workweek without interruptions from psychologically based symptoms | | X | | | |
| J. | Perform at a consistent pace without an unreasonable number and length of rest periods | | | | X | |
| K. | Ask simple questions or request assistance | | X | | | |
| L. | Accept instructions and respond appropriately to criticism from supervisors | | | X | | |
| M. | Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes | | | | X | |
| N. | Respond appropriately to changes in a routine work setting | | | X | | |
| O. | Deal with normal work stress | | | | X | |
| P. | Be aware of normal hazards and take appropriate precautions | | X | | | |

(O) Explain limitations falling in the three most limited categories …

AR 1547.[10] For semi-skilled and skilled work activities, Williams found:

| II. | MENTAL ABILITIES AND APTITUDES NEEDED TO DO SEMISKILLED AND SKILLED WORK | Unlimited or Very Good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Understand and remember detailed instructions | | | | X | |
| B. | Carry out detailed instructions | | | | X | |
| C. | Set realistic goals or make plans independently of others | | X | | | |
| D. | Deal with stress of semiskilled and skilled work | | | | X | |

---

[10] The following definitions were provided:

- *Seriously limited, but not precluded* means ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances.

16

AR 1548.  For "particular types of jobs," Williams found:

| III. | MENTAL ABILITIES AND APTITUDE NEEDED TO DO PARTICULAR TYPES OF JOBS | Unlimited or Very Good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Interact appropriately with the general public | | X | | | |
| B. | Maintain socially appropriate behavior | | X | | | |
| C. | Adhere to basic standards of neatness and cleanliness | | X | | | |
| D. | Travel in unfamiliar place | | | X | | |
| E. | Use public transportation | | | X | | |

*Id.*  Williams added that the Claimant's "daily depression, anxiety and symptoms . . . can be unpredictable," making it unlikely that he would "be able to hold a regular job." AR 1549.  Finally, Williams estimated that the Claimant's limitations began around June 2019.  AR 1550.

At the ALJ's hearing, the Claimant testified that his combat-related sleep issues caused fatigue; that his depression and memory issues made it difficult for him to practice self-care; how integral his service dog is for helping him go in public and interact with others; and that his concentration issues posed problems for him multitasking.  AR 40–45, 52–54, 56.  He further testified to running a mead-making business that was a significant stressor in his life.  AR 56.  While he did not provide details about business operations, he talked about how his memory problems forced to him have "four different notebooks or apps on my phone" for managing the business.  *Id.*

The ALJ acknowledged the Claimant's reported mental impairments but generally found them "mild" in each category.  AR 14.  Significant to the forgetfulness category was the Claimant's second neuropsychological evaluation, which suggested "a cognitive

---

- *Unable to meet competitive standards* means your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting.

- *No useful ability to function*, an extreme limitation, means your patient cannot perform this activity in a regular work setting.

AR 1547.

profile generally within accepted limits," AR 826, and a spate of doctors' contemporaneous notes observing an intact memory. *See, e.g.*, AR 732, 760, 814, 936, 987, 1052. Regarding concentration, the ALJ cited to the Claimant's report that he could read and watch TV well; could complete basic tasks such as meal prep, lawncare and driving; and a single doctor's note from 2024 recorded a normal attention span and concentration. AR 275, 1627. On adapting or managing himself, of note was the Claimant's belief that he could manage stress well (even if he did not feel comfortable handling changes in his routine), AR 280, and medical observations noting that the Claimant was well-groomed with good insight and judgment. *See, e.g.*, AR 732, 1364, 1436, 1479, 1562. Finally, with regard to public interaction, the Claimant reported getting along "well" with authority figures without ever having been fired because of troubles getting along with others, AR 272, and medical observations noted he was regularly calm and cooperative. *See, e.g.*, AR 729, 870, 1435, 1535.

The ALJ went on to find at step four that the alleged impairments did not have much impact on the Claimant's RFC. In doing so, he emphasized the largely-average scores from the Claimant's last formal neuropsychological evaluation in 2021 and found the non-examining consultants' evaluations to be persuasive. AR 17, 19. The ALJ also found Williams' Mental Medical Source Statement not persuasive, believing her opinions were inconsistent with her treating notes as well as other record evidence.

### 1. Persuasiveness of Williams' Opinions

Because a claimant's RFC is a medical question, it must be supported by at least some medical evidence. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). How an ALJ interprets physicians' findings is largely left to his or her discretion. *Marbry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016); *see also* 20 C.F.R. § 416.920c(a) (ALJ "will not defer or give any specific evidentiary weight" to medical opinions). That discretion, however, is controlled by the admonition that ALJs not "play doctor" by making unreasonable inferences from the medical record or elevating their own judgment over

18

the opinions of the medical providers. *Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009). Five factors shape how an ALJ will consider medical opinions: "(1) whether it is supported by objective medical evidence and the provider's own explanations, (2) whether it is consistent with other evidence in the record, (3) the relationship the provider has with the claimant, (4) the provider's specialization, and (5) any other relevant factors." *Cropper v. Dudek*, 136 F.4th 809, 813 (8th Cir. 2025) (citing 20 C.F.R. § 404.1520c(c)(1)–(5)). Of those factors, the first two are most important. *Id*. In fact, the first two factors are all an ALJ must articulate in his or her findings on persuasiveness. 20 C.F.R. § 416.920c(a).

Williams is an advanced registered nurse practitioner who works in psychiatry and manages the Claimant's psychiatric medications. She saw the Claimant seven times over 14 months before she wrote her Mental Medical Source Statement. AR 729, 738, 1472, 1477, 1454, 1560, 1574. However, the ALJ found her opinion not persuasive based on internal inconsistencies between Williams' treatment notes and final opinion, as well as finding the medical record in its entirety tended to conflict with the opinion. For example, although Williams indicated that the Claimant's limitations likely began around June 2019 (before Williams had begun seeing him), AR 1550, that same year the Claimant had graduated college without accommodations and with a high GPA. AR 826. The Claimant's medical record also suggested his mental symptoms were stable since at least 2020. *See, e.g.*, AR 753, 809, 895, 933, 1464. Yet during that time the Claimant had been able to work full-time, including a span in 2021 when he was working 70+ hour weeks until he obtained a doctor's note cutting him back to 40 hours. AR 828, 848, 875. The years 2021 and 2022 were also his highest earning years. AR 252.

Williams' own notes can also be taken as contradictory. Throughout the Claimant's seven visits, Williams consistently observed him as calm, cooperative, well-groomed and euthymic with a grossly intact memory. *See, e.g.*, AR 1435–36, 1474, 1479. The Claimant objects that the observations come with the caveat of being documented without formal testing. Doc. 8 at 18. Nonetheless, Williams' objective and

19

contemporaneous impressions of the Claimant's mental facilities support the ALJ's persuasiveness finding, especially when Williams had not formally tested the Claimant before giving her Mental Medical Source Statement. *Cf. Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (objective examinations revealing no abnormalities can be considered even when in contrast to an ultimate opinion). In addition, when the Claimant's cognition was last tested during his 2021 neuropsychological evaluation, objective observations similarly noted no abnormalities. *See* AR 824.

The Claimant further contends that the ALJ placed too much focus on Williams' objective impressions without considering Williams' explanations for her opinions in the Mental Medical Source Statement. Doc. 8 at 23. Williams' written explanations for her thoughts on the Claimant's aptitude recited how he had described his impairments. *See* AR 1547 ("Veteran describes significant difficulty with concentration . . . ."), 1548 ("[Claimant] describes difficulty with memory . . . ."). The ALJ can consider such heavy reliance when analyzing the supportability of a medical opinion. *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022). Regardless, I disagree with the Claimant's framing. The ALJ considered Williams' explanations. The fact that he found them contradicted by other record evidence and decided the explanations were not persuasive does not warrant reversal.

Substantial evidence supports the ALJ's decision to not adopt Williams' opinion. Though reasonable minds might have thought differently, that is not grounds for reversal.

### 2. *Evaluation of Mental Impairments*

As noted above, the ALJ found the Claimant's mental impairments non-severe at step two and a nonfactor in formulating his RFC. When breaking down the Claimant's alleged impairment into the four broad areas for evaluating its severity, I conclude that substantial evidence supports the ALJ evaluation of the Claimant's forgetfulness, concentration and self-management. For forgetfulness, the Claimant's 2021 neuropsychological evaluation suggested his "cognitive profile [was] generally within

20

expected limits" with "subtle inefficiencies," and also "encouraging." AR 826. Numerous objective medical observations reported intact memory. *See, e.g.*, AR 732, 760, 814, 830, 936, 1052. A report in 2023 noted how the Claimant could "verbalize knowledge of the medications prescribed including administration, storage, purpose, risks, benefits and side effects." AR 743.[11] The Claimant successfully graduated college around 2019 without accommodations, while six years earlier he had dropped out because of memory problems, and records reflect his mental impairments were stable since 2019.

The Claimant also represented his ability to perform multi-step tasks daily and could read and watch TV well, AR 276–78, even if he did later renege on his reading capabilities. AR 53. His commercial mead-making also suggests he had the capacity to maintain a schedule, focus on a matter at hand and have the prospective memory (through reminders if necessary) to attend to future matters. AR 20. As the ALJ noted, the Claimant's subjective reporting of his problems could suggest a greater impairment. However, the ALJ was within his prerogative to assign less weight to unverifiable subjective reporting when other evidence suggests something different. *Id.* While there is evidence in the record that points the other way for each of these three functional areas, the ALJ's analysis and conclusions have substantial support.

However, the record needs further development regarding the Claimant's ability to interact with others. Significant record evidence ties his ability to be in public to having his service dog accompany him. *See, e.g.*, AR 43 ("Before I had [my dog], I wasn't able to really leave my house or do grocery shopping or anything out."), 271 ("[C]annot go without service dog."), 891 (service dog "extremely helpful" for managing PTSD), 1367 (eight years of increased isolation "that has improved over the past 2 years with the assistance of his service dog"). In 2020, the Claimant's psychiatry office completed an accommodation form to allow his dog to be with him at work due to the Claimant's anxiety and PTSD. AR 900, 937. Practically every medical appointment that

---

[11] There were 14 listed active medications at the time the note was taken.

21

the Claimant attended documented his dog being by his side.  *See, e.g.*, AR 1013, 1017, 1052, 1054, 1060, 1062.  The Claimant's service dog even accompanied him to the 2024 hearing, at which the Claimant testified to how impactful the dog's companionship was for him going out in public.  AR 43.

Despite this evidence, the ALJ made one passing reference to Claimant's dog—which he called an emotional support animal—without otherwise analyzing the dog's impact on the Claimant's social capabilities.  *See* AR 17.  There does not appear to be Eighth Circuit authority as to when an ALJ should consider a service dog in his or her analysis.  However, Judge Mahoney noted that other courts have held that an ALJ should address a claimant's service dog as an indicator of an impairment when certain factors are present.  These include: (1) a medical provider recommended use of the service dog in a workplace function and (2) the dog was brought to medical appointments or otherwise utilized in everyday life.  *See* Doc. 13 at 26–28 nn.34–38; *see also Cruz v. Comm'r of Soc. Sec.*, 406 F. Supp. 3d 1337, 1346–47 (M.D. Fla. 2019) (compiling cases).  I agree with Judge Mahoney that both factors are present in this case and, as a result, the ALJ should have addressed the service dog as a potential indicator of an impairment.  Doc. 13 at 28.

Whether this error was harmless, as Judge Mahoney found, is a closer call.  The ALJ placed significant weight on clinicians' observations of the Claimant's calmness and cooperability in analyzing his ability to interact with others.  However, those observations might misrepresent the Claimant's true limitations when factoring in the presence of the Claimant's dog at each appointment.  Judge Mahoney is correct that, given the ALJ's finding that Claimant could return to his past relevant work as actually performed, which apparently included accommodation of his service animal,[12] the step four conclusion

---

[12] The Claimant challenges whether the record was sufficiently developed to make the inference that his service dog was allowed at his work.  The fact that the psychiatry office filled out an accommodation form on the Claimant's behalf is sufficient to make the inference.  Moreover, if

should remain the same.  *See* SSR 11-2P, 2011 WL 4055665, at *9 (Sept. 12, 2011) (reasonable accommodations will be considered for social security disability determinations in limited instance that claimant could return to past relevant work and had been previously given the accommodation).  However, the record offers enough dueling evidence such that I would have to speculate on the implications of correcting the ALJ's error.  *Cf. Christi S. v. Berryhill*, No. 17-cv-4067, 2018 WL 3586277, at *3 (D.S.D. July 26, 2018) (remanding case because court would otherwise have to speculate on the consequence of the corrected error).  Consequently, I cannot find the error harmless.  On remand, I will direct the ALJ to specifically address the Claimant's service dog as a potential indicator of an impairment in connection with the Claimant's ability to interact with others

### IV.    CONCLUSION

For the reasons set forth herein:

1.      The Report and Recommendation (Doc. 13) is **adopted in part** and **not adopted in part**.  It is **not adopted** insofar as it (1) finds that substantial evidence supports the ALJ's determination regarding the severity and impact of the Claimant's migraine headaches and (2) finds that the ALJ's failure to discuss the Claimant's service dog as evidence concerning the severity of the Claimant's mental impairments was harmless error.  The remainder of the R&R is **adopted**.

2.      The Commissioner's decision is hereby **reversed** and this case is **remanded** for further administrative proceedings consistent with this order.

3.      Judgment **shall enter** in favor of the Claimant.

---

the Claimant's past employer had not allowed his service dog, a recent work history without the benefit of a service dog would seem to lessen the impact of his mental impairment in this functional area.

23

4.      If the Claimant wishes to request an award of attorney fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, an application may be filed up until 30 days after the judgment becomes "not appealable," i.e., 30 days after the 60-day time for appeal has ended.  *See Schaefer*, 509 U.S. at 302; 28 U.S.C. § 2412(d)(1)(B), (d)(2)(G).

**IT IS SO ORDERED** this 19th day of March, 2026.

_____
Leonard T. Strand
United States District Judge

24